UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FITNESS QUEST INC., | ) | CASE NO. 5:06CV02691 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| JONATHAN MONTI, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

This matter comes before the Court upon the motion of Plaintiff Fitness Quest, Inc. ("FQ") for summary judgment (Doc. No. 108) and the motion of Defendant-Counterclaimant Jonathan Monti ("Monti") for partial summary judgment (Doc. No. 130). The parties have filed their respective oppositions and replies, and the motions are ripe for consideration. For the reasons that follow, FQ's motion for summary judgment is **GRANTED** and Monti's motion for partial summary judgment is **GRANTED**, in part, and **DENIED**, in part.

**I.     Factual and Procedural History**

Defendant Jonathan Monti was one of the inventors listed on U.S. Patent Number 6,932,749 (the "'749 Patent") and is, for purposes of this litigation, the patent holder. The '749 Patent was issued on August 23, 2005, for an invention that "provides a means of exercising wherein the gross body movements of the body during exercise are Kinesiologically Correct." See Abstract, '749 Patent. The claims at issue detail a machine on which a user may perform back extension exercises by bending at the torso and moving downward, and then pulling the torso back upward with the lower back muscles.

1

FQ markets and sells the Ab Lounge® exercise product, an exercise machine specifically intended to exercise the abdominal muscles in a "jack-knife" fashion, whereby one sits in the chair-like device, bends back beyond the horizontal 180 degrees and then lifts back to the sitting position, approximately 90 degrees. FQ began selling the Ab Lounge product line in October 2003, and has had great success in marketing the product. (Doc. 109, Clark Decl. at ¶ 10.)

Before FQ began selling the Ab Lounge products,[1] Monti contacted it in July of 2002 seeking to license his invention. He termed his invention "a multi-movement machine that one could do assistive or resistive push-ups, sit-ups, leg lifts and back extensions on."[2] (Doc. No. 113, Ex. 23.) The parties then negotiated a confidentiality agreement. (Doc. No. 131, Ex. 36.) FQ did not express interest thereafter in producing Monti's device, and submits that it notified him that it was not interested. (Doc. No. 113, Ex. 3; Doc. 113, Ex. 21; Doc. 108, 6.)

Meanwhile, FQ was developing the Ab Lounge device. In January 2003, FQ engaged design engineer Frank Smith to develop the commercial product. He reviewed a patent of an invention conceived by Wendy Wirth (U.S. Patent No. 5,681,250), and added "styling" such as curved handles to the pre-existing chair design of that invention.[3] (Doc. 113, Ex. 8, 47-51.) On January 28, 2003, FQ provided its supplier, Super Made Products Co., Ltd. ("SMP"), with the drawing of the Ab Lounge device. (Doc. No. 113, Ex. 9.) SMP added a cross bar and bungee cords to the bottom of the chair "to keep the seat in place for the user to mount and

---

[1] Monti asserts that the Ab Lounge Ultra, Ab Lounge Sport, Ab Lounge Plus, Ab Lounge 2, Ab Lounge 2 Max, Ab Lounge Pro, and Ab Lounge Supra infringe claims 15 and 20 of the '749 Patent. Monti further asserts that the Ab Lounge, Ab Lounge XL, Ab Lounge XL Pro/Professional, Ab Lounge Ultra Sport, Ab Lounge Club, Ab Lounge Max, Ab Lounge Extreme, Ab Lounge Elite, and Ab Lounge Ultimate infringe claims 15, 20 and 28 of the '749 Patent.

[2] When Monti submitted his invention to FQ for consideration, the invention was covered by U.S. Patent No. 6,387,024 ("the '024 patent"), not the '749 Patent at issue in this case. Monti secured the '749 Patent on August 23, 2005.

[3] FQ has paid Wirth's company Wenco, Inc. millions of dollars in royalties from the Ab Lounge product.

dismount the chair." (Doc. No. 113, Ex. 11.) FQ went on to market the device as a series of products known as Ab Lounge.

In July of 2006, Monti's attorneys notified FQ that they believed the Ab Lounge infringed Monti's '749 patent, which had issued on August 23, 2005. (Doc. No. 113, Ex. 27 & 28.) Monti also claimed that he had disclosed the technology for the Ab Lounge product line to FQ under the terms of the confidentiality agreement, and that FQ had incorporated Monti's technology into its Ab Lounge product line. (*Id.*) FQ then filed this lawsuit seeking a declaratory judgment that it had not infringed Monti's patent, that the '749 Patent was invalid, and that it had not breached the confidentiality agreement. Monti counterclaimed seeking damages for infringement, breach of the confidentiality agreement, and unjust enrichment.

Monti alleges that FQ has infringed three claims of the '749 patent by selling the Ab Lounge product line. The claims at issue – 15, 20 and 28 – are similar, and the parties devote the majority of their briefs to arguing the meaning and application of Claim 15, which provides as follows:

> A supportive back extension exercise apparatus adapted for providing an individual with support as a user moves between an upper first position and a lower second position during performance of back extensions, comprising:
>
> an elongated user support having a horizontally oriented body pad with a first end and a second end, the body pad having a longitudinal axis and a lateral extent extending perpendicular to the longitudinal axis and between a first side of the body pad and a second side of the body pad;
>
> a guide member pivotally secured to the user support for movement relative thereto between the first position and the second position wherein the first position is oriented above the second position and the guide member pivots about a substantially horizontal axis which is substantially adjacent to the first end of the body pad, the guide member including a transversely oriented support extending across the user support such that a user may rest their torso thereupon while performing back extensions, the transversely oriented support extending substantially across the entire lateral extent of the body pad; and

3

> a force producing assembly mechanically linked between the user support [and] the guide member, the force producing assembly selectively applying a force biasing the guide member toward the first position such that as a user bends upon the user support with the torso of the user supported upon the guide member and the lower body of the user supported upon the body pad the force producing assembly will apply supportive force urging the user toward the first position as the user performs back extensions moving from the first position to the second position and moving from the second position to the first position.

Claim 20 is a dependent claim of Claim 15, wherein "the force producing assembly may selectively apply force in a direction urging the guide member toward the first position." Claim 28 is similar to Claim 15, but requires an "auxiliary body support" (shown in the preferred embodiment as an arm with pads for a user to rest her feet upon while exercising).[4]

## II.    Law and Analysis

### A.  Standard of Review

This Court's consideration of the motions for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* The party opposing a motion for summary judgment made according to Rule 56 "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The entry of summary judgment is not a disfavored procedural shortcut, but instead is mandated by "the plain language of Rule 56(c) . . . after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

---

[4] Although the Court held its Markman hearing on June 26, 2007, and issued its ruling regarding the disputed terms in the claim, the parties continue to argue the meaning of claim terms.

4

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing a motion for summary judgment may do so with "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.* at 324. The nonmovant must show more than a scintilla of evidence to overcome summary judgment. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In addition, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex,* 477 U.S. at 322.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. *Id*. at 252. A non-movant is not permitted to rest upon the allegations in the complaint, but must produce affirmative evidence in support of each and every element of each claim. *Id*. at 150. In light of this standard, the Court considers Defendant's dispositive motion.

### B. Patent Infringement

Patent infringement occurs when every claim or its equivalent is found in the accused product. *In re Gabapentin Patent Litigation*, 503 F.3d 1254, 1259 (Fed. Cir. 2007). Infringement is a question of fact, *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1356 (Fed. Cir. 2007), so the Court must decide whether a genuine issue of material fact exists regarding infringement such that no reasonable jury could find in favor of one of the parties. *Gabapentin*, 503 F.3d. at 1259. Particularly important to the dispute at hand, the Federal Circuit has explained, "Where the parties do not dispute any relevant facts regarding the accused product . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007) (ellipsis in original) (quoting *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997). Indeed, even where the Court has previously determined that a claim term "needs no contruction," if the ordinary meaning of a term does not resolve the parties' dispute, the court must determine the appropriate scope of the claim as a matter of law. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, No. 2007-1302, 2008 U.S. App. LEXIS 7053, at *22-23 (Fed. Cir. Apr. 3, 2008).

1. Selectively Applying a Force

FQ argues that the Ab Lounge does not "selectively apply a force" as required by the '749 Patent. FQ contends that Monti's current argument regarding the meaning of "selectively applying a force" is contradicted by his prior argument asserted during claim construction. Monti currently argues that "selectively applying a force" merely means that the force producing assembly stores energy according to the angular displacement of the guide

member, and then applies a degree of force based on that angular displacement, regardless of the user's weight or other needs.

In contrast, at the claim construction hearing, Monti's counsel argued that "selectively applying a force" meant "the force producing assembly applying an appropriate force to bias the guide member as needed during the exercise." He said,

> Because what happens is, within the system there may be a 120 pound load on it, or maybe a 220 pound man. So what the system has to do in the force producing assembly is it has to be selective. How much energy am I going to absorb? How much energy do I need to have this person complete the exercise? That's where the selective comes in. It's the system itself, the assembly itself that's selecting the amount of energy that's needed to complete the exercise, to assist.

(Doc. No. 39, at 180.) He returned to the example later in the hearing.

> Claim 15 is the system itself selectively applying the force to bias the guide member. This goes back to the point I made before. You may have a 250 pound man or you may have a 120 pound woman, and they are both using the same system. The system has to do a selection in terms of what, what amount of energy does it have so that it can then assist the, the user when they are moving against gravity.

(Doc. No. 39, at 196.)

Following the Markman hearing, the Court adopted Monti's definition of "selectively applying a force."[5] FQ now argues that, because it is undisputed that the bungees of the Ab Lounge (which Monti claims constitute the "force producing assembly") do not apply force based on the weight of the user, but only based on how tightly they are pulled due to the angular displacement of the chair's back, summary judgment is warranted. Monti argues that FQ is improperly imposing limitations on the claim language.

Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply

---

[5] The Court adopted Monti's proposed definition and held that "selectively applying a force" meant "the force producing assembly applying an appropriate force to bias the guide member as needed during the exercise." (Doc. No. 57, at 14.)

7

because his interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The doctrine's purpose is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id*. at 855-56. Parties cannot abuse the process by "playing fast and loose with the courts." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002).[6] *See also Reynolds v. Commissioner*, 861 F.2d 469, 472 (judicial estoppel is a rule against "having [one's] cake and eating it too"). Courts generally examine three factors to decide whether to apply judicial estoppel: (1) a party's later position must be clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that the Court was previously misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Lewis v. Wyerhaeuser Co.*, 141 F. App'x 420, 425 (6th Cir. 2005). Judicial estoppel is "an equitable doctrine invoked by the court at its discretion." *New Hampshire*, 532 U.S. at 750.

Monti now claims that the example his counsel referred to at the claim construction hearing was to illustrate that the "rate at which energy is absorbed and released by the force producing assembly will be very different whether the user is a 120 pound women [sic] or a 250 pound man." (Doc. No. 146.) Monti did not argue during the claim construction hearing, though, about the rate of energy absorption. Instead, he claimed that, because the system may have a 120 pound woman or a 220 pound man, it must determine, "How much energy do I need to have this person complete the exercise?" Monti clearly advocated that the system must

---

[6] The Federal Circuit applies regional circuit law to address judicial estoppel. *Biomedical Patent Mgmt. Corp. v. California*, 505 F.3d 1328 (Fed. Cir. 2007).

8

determine that amount of force to apply with reference to the weight of the individual using the device. This position is directly contrary to his current position, which is that the force producing assembly applies a force irrespective of the user's weight. The Court adopted Monti's previous construction and finds that FQ would suffer an unfair detriment if Monti was not estopped because Monti could defeat summary judgment by assuming a contrary position now that the facts show his prior position is unhelpful to him. In a complicated patent case which requires the Court to discern the meaning of technical terms like "selectively applying a force," "substantially adjacent," and "extending substantially across the entire lateral extent of the body pad," the Court finds judicial estoppel to be particularly applicable, as the opportunities for modifying positions to unfairly prejudice opposing parties are many.

Monti is thus estopped from arguing a position other than that which he advocated at the Markman hearing – that the force producing assembly of the asserted claims must itself adjust or respond to the user's weight to apply an appropriate amount of force as needed – which led the Court to adopt his construction of "selectively applying a force" as requiring "an appropriate force to bias the guide member as needed during the exercise." The undisputed evidence shows that the bungee cords of the Ab Lounge apply force to the chair regardless of the user's weight. (Doc. No. 113, Ex. 34 at 54; Ex. 33 at 227-29; Ex. 36 at 54.) Summary judgment of noninfringement is therefore warranted.

  2. Back Extensions

Summary judgment is also warranted because the Ab Lounge does not meet the "back extensions" limitation found in Claims 15 and 20. These claims mandate that a user may rest her torso upon the transversely oriented support while performing "back extensions" and that the force producing assembly will apply supportive force urging the user toward the first position

while the user performs "back extensions." In order to evaluate whether the Ab Lounge meets these claim limitations, the Court must clarify its construction of the term "back extensions."

To import limitations from the written specification into the claims is a "cardinal sin of claim construction." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). The Federal Circuit teaches, however, that "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance, [] the inventor has dictated the correct claim scope, and the inventor's invention, as expressed in the specification, is regarded as dispositive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

In the case at hand, Monti, the inventor, explicitly limited the scope of the claims in the '749 patent. The specification states

> A back extension is the backward movement of the torso and upper body to straight posture. Kinesiologically, this is characterized by the pulling of the lower back and postural muscles to extend the torso so that a person can assume straight posture. Many Nautilus type machines have been constructed in the prior art to mimic this movement and add resistance to it, biomechanically, the core movement of this type of machine was a **pushing movement**. This is a distinct disadvantage of the prior art methods of back extension. Also, **this does not fall within the scope of Kinesiologically Correct** which has been stated already hereinbefore.
>
> \* \* \*
>
> A still further specific advantage of the present invention is that it is performed with a Kinesiologically Correct pulling movement as opposed to the prior art Nautilus type machines that perform an incorrect and unnatural pushing movement hereinbefore described.

Monti could not have been more clear in describing his intent to disavow any construction of his claims that included a pushing movement when a user performed a back extension by moving her torso and upper body backward to straight posture. He distinguished his machine from others which required a pushing movement and described his machine as "Kinesiologically Correct." The Court has previously held that the phrase "back extension" in

10

claim 15 is not limited to prone (face down) extensions, but could include face up extensions as well. (Doc. No. 57, 12.) This does not mean, however, that "back extensions" may include the back extensions performed on the Ab Lounge. Monti made his intent to limit the scope of his claim explicitly clear, that "back extensions" within Claims 15 and 28 are limited to back extensions where a user is not pushing against the transversely oriented support. Accordingly, the Court clarifies its prior construction of "back extensions" in Claim 15 and holds that "back extensions" is limited to those extensions where a user is not pushing against the transversely oriented support as she moves the torso and upper body backward to straight posture. *See Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) ("Our opinions have repeatedly encouraged claim drafters who choose to act as their own lexicographers to clearly define terms used in the claims in the specification. [. . .] The specification acts a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.")

In the case of the Ab Lounge products, when a supine user moves her upper body and torso back to straight posture, the bungees provide force against the user's back such that a user must perform a pushing movement against the resistance of the chair's back. (Doc. No. 113, Ex. 34 at 64-67; Ex. 17 at 176-178, 193.) Additionally, unlike Monti's invention, the Ab Lounge products are unsuitable for face down back extensions. (Doc. No. 111, Ex. 1; Doc. No. 113, Ex. 34 at 70.) Monti does not dispute these facts. Instead, he argues that a user performing supine back extensions on the Ab Lounge is not performing the "pushing movement" because above 170 degrees, the force of the bungees is completely countered by friction and the weight of the

chair's back, such that a user's weight causes the chair's back to fall until it reaches 170 degrees.[7] This argument disregards the undisputed fact that the bungees resist the user when she extends her back past 170 degrees to perform a back extension exercise. Where Monti has defined the "second position" of a back extension as reaching 210 degrees on the Ab Lounge, such that a "back extension" includes movement from 98 degrees to 210 degrees, he cannot then argue that the user pushing against the chair's back from 170 degrees to 210 degrees is irrelevant. Monti specifically and clearly disclaimed such an action as outside the scope of his patent specification, and this Court must give force to such limitations. *Phillips*, 415 F.3d. at 1316. As such, summary judgment for noninfringement of Claims 15 and 20 is warranted.

> 3. Horizontally Oriented Body Pad Having a First End, a Second End, A First Side and a Second Side

The '749 Patent requires that the body pad have a first side and a second side between which the lateral extent extends, and a first end and a second end, between which the longitudinal axis extends. These "sides" and "ends" constitute clear boundaries which serve as points of orientation for other parts of the device. It is undisputed, however, that the fabric that forms the back of the chair of the Ab Lounge is the same fabric that runs down to form the seat. (Doc. No. 131, Ex. 7 at ¶ 38.) It is all one piece, and does not provide a clear fourth boundary. (*Id.*; *See* Doc. No. 190, 9.) While the fabric covers the machine's frame to provide clear boundaries to the left, right, and front of the supine user, it does not provide a clear boundary

---

[7] In addition, the Court cannot discount the fact that a user must perform a "pushing movement" upon the chair's back to overcome friction to start the downward movement when exercising on the Ab Lounge. (Doc. No. 140, Ex. 12 at ¶ 9) ("The friction forces are "always in a direction opposite the direction of motion of the user.") Indeed, Monti's invention emphasizes a pulling movement as kinesologically correct. His preferred embodiment shows a device whereby a user would experience resistance by pulling on the transversely oriented support and would experience assistance by the support providing force against the user's chest to aid upward movement. Thus, because the user must overcome force against her back to perform back extensions on the Ab Lounge, the device is outside this claim limitation. Regardless, because it is absolutely clear that the Ab Lounge provides force that a user must push against while declining between 170 and 210 degrees with respect to the horizontal, the Ab Lounge requires a pushing movement that is excluded by the '749 Patent.

behind the user except for the top of the machine, which is typically above the user's head while in use. Although the fabric extends around the seat frame and creates a pocket which holds the seat frame, the fabric remains one piece covering the entire frame. (*See* Doc. No. 190, 9.) Thus, what Monti contends constitutes the "body pad," i.e. the portion of the fabric that supports the user's lower body during exercise, only has three defined sides. (Doc. No. 131, Ex. 6. ¶38.)

The differences in opinion of the parties' experts about how to measure the length of the "body pad" is illustrative. FQ's expert measures from both the seat pivot bolt and the chairback pivot bolt to the front of the device. (Doc. No. 190, Ex. 1 at 2-3, 9-10.) Monti's expert measures the seat's length from the intersection of the seat and the chair's back to the front of the device. (Doc. 191, Ex. 3 at ¶ 3.) This intersection point chosen by Monti's expert is arbitrary, though, because the fabric is all one piece. Discerning the length of the seat is difficult precisely because the fabric has no defined stopping point in this direction, besides going all the way up to the top of the machine. Claims 15 and 28, however, require an actual boundary, an "end" or a "side," and do not allow Monti merely to point to an arbitrary spot on the continuous fabric and summarily proclaim that it constitutes an end or a side.

Because the top of the chair is the only clearly marked boundary to provide the fourth boundary for the body pad, the Ab Lounge chair's back must be part of the "body pad." This "body pad" is not, however, horizontally oriented. The top of the chair rests at 98 degrees relative to the horizontal, according to Monti's experts. (Doc. No. 191, Ex. 72 at ¶ 3.) It is 8 degrees from completely vertical. "Horizontally oriented" as used in the patent may encompass pads which are not exactly horizontal. The top of the chair back on the Ab Lounge, however,

13

which rests only 8 degrees from vertical is not, by any stretch, "horizontally oriented."[8] Accordingly, the Court finds that there is no genuine issue of material fact that the Ab Lounge does not include a "horizontally oriented body pad."

> 4. The "transversely oriented support extending substantially across the entire lateral extent of the body pad"

Monti argues that "extending substantially across" means "that the support member is at an elevation above the body pad." (Doc. 146, 23.) Even accepting Monti's definition, summary judgment is warranted.

As previously detailed, it is undisputed that the fabric that forms the back of the chair of the Ab Lounge is the same fabric that runs down to form the seat. (Doc. No. 131, Ex. 7 at ¶ 38.) Monti claims that the fabric that forms the chair's back is a "transversely oriented support." The chair's back, however, is not situated at an elevation above the seat of the Ab Lounge (the alleged body pad) because the fabric is actually connected with the seat. One piece of fabric forms the entire Ab Lounge body support. It cannot be at "an elevation above" itself. Because it is not at an elevation above the body pad, even where the Court accepts Monti's

---

[8] Monti has attempted to avoid summary judgment as to the body pad not being "horizontally oriented" by submitting an affidavit from its expert accompanying its summary judgment opposition. The affidavit offers the expert's opinion that the seat of the Ab Lounge infringes under the doctrine of equivalents. This affidavit was offered long after the Court's expert discovery deadline passed and asserts an entirely new claim. Monti has pursued only literal infringement throughout this litigation. He cannot circumvent this Court's deadlines and unfairly inject upon FQ a completely new theory for which he has provided no discovery during the appropriate periods as set by this Court, particularly after the summary judgment briefs have already been filed and the parties are engaged in final trial preparations. Accordingly, Fed. R. Civ. P. 37(c) mandates that this Court strike the portions of the affidavit concerning the doctrine of equivalents. In addition, even if the Court considered the affidavit, the Court's conclusion regarding summary judgment would not change because the "doctrine of equivalents cannot be used to erase meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *V-Formation, Inc. v. Benetton Group SPA*, 401 F.3d 1307, 1313 (Fed. Cir. 2005). Monti therefore cannot use the doctrine of equivalents to erase the requirement that the body pad be "horizontally oriented."

argument regarding the claim's construction, summary judgment is warranted.[9]

### C. Breach of Contract

Monti also claims that FQ breached the parties' confidentiality agreement. Under Ohio law, a breach of contract claim requires a *prima facie* showing of the following elements: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Thomas v. Publishers Clearing House*, 29 F. App'x 319, 322 (6th Cir. 2002) (citing *Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (2nd Dist. 1994)).

As an initial matter, the Court must address the parties' contentions regarding the existence of a contract. Although FQ argues that no contract was formed because Monti did not convey his acceptance to FQ, the undisputed evidence shows that the parties executed the confidentiality agreement in 2002. Monti has produced a copy of the Confidentiality Agreement signed by him, and an e-mail conveying his acceptance. (Doc. No. 131, Ex. 84.) He has also testified that he conveyed his acceptance to FQ, and FQ has not provided evidence to dispute this acceptance. (Doc. No. 131, Ex. 38 at 199.) FQ attempts to defeat summary judgment on this point by relying upon the testimony of a witness who testified that she had no recollection regarding the receipt of the contract.[10] (Doc. 131, Ex. 37 at 54.) Such testimony is insufficient to

---

[9] Monti's position is also flawed because the Patent teaches a device which has a body pad and a separate transversely oriented support. By using different terms, "body pad" and "transversely oriented support," the claims make clear that the body pad and transversely oriented support are not the same thing. In addition, Claim 15 differentiates between the two by requiring the guide member, which includes the transversely oriented support, to pivot about a substantially horizontal axis which is substantially adjacent to the first end of the body pad. Claim 28 differentiates between the two by mandating that the body pad is part of the user support while the guide member which includes the transversely oriented support is pivotally secured to the user support. In the Ab Lounge, however, as previously described, it is undisputed that the fabric that supports the user's body is one piece, such that it cannot be arbitrarily separated into the "body pad" and the transversely oriented support.

[10] The witness also testified that she did not have any reason to believe she did not receive the signed contract. (Doc. 131, Ex. 37 at 54.)

create a genuine issue of material fact. *Wysong v. City of Heath*, No. 06-4433, 2008 U.S. App. LEXIS 2192, at **6-7, (6th Cir. Jan. 22, 2008). Accordingly, Monti is entitled to summary judgment FQ's claim for a declaratory judgment that no confidentiality agreement existed.

FQ argues that, even if the parties did execute an enforceable contract, it did not breach the contract. The agreement states that FQ "shall use such submitted information only for the purpose of this evaluation and shall return to Discloser at the conclusion of the evaluation all submissions received in the event no formal agreement is entered into." (Doc. No. 50, Ex. 2.) It also states, however, that the obligations "shall not extend to information (a) which is or shall become known to [FQ] as evidence [sic] by written records before receipt thereof from [FQ]; (b) which is disclosed to [FQ] in good faith under no obligation of confidence by a third party who has a right to make such disclosure; or (c) which is or has become part of the Public Domain through no fault of [FQ]."

Monti alleges that he disclosed to FQ the ideas for (1) a force producing assembly mechanically linked between the user support and the guide member which supports the user against the effect of gravity during exercise; and (2) the benefit of lowering the pivot point where the force producing assembly is mechanically linked to the guide member. Monti contends FQ used that information in its Ab Lounge product line.[11] It is undisputed, though, that FQ began distributing a product known as the Ab Lifter Plus in May 2001 under a license from Dosho Shifferaw which disclosed both of the ideas Monti claims FQ misappropriated from him. (Doc. 109, ¶¶ 7-8; Doc. 112, Ex. 2 at ¶ 52.) It is also undisputed that the Ab Lifter Plus device was disclosed in International Publication No. WO 01/62353 in August, 2001. (Doc. No. 112, Ex. 6.)

---

[11] Although Monti originally claimed FQ has misappropriated other information as well, it only opposed FQ's motion for summary judgment on the basis of "lowering the pivot point about which the guide arm rotates." This is presumably because the other information was already in the public domain pursuant to Monti's '024 Patent before he disclosed it to FQ, thereby rendering it outside the parties' agreement.

These undisputed facts reveal that there is no genuine issue of material fact that FQ did not breach the contract because the information Monti alleges FQ misused was specifically excluded by the contract's terms.

Monti does not present evidence to contradict these facts. Instead, he makes two arguments which fail to recognize the dispositive issue. First, he argues that FQ did not use the Ab Lifter Plus in designing the Ab Lounge, so it is liable for using his idea. However, whether FQ used the information does not affect whether FQ had a duty to refrain from using the information. Under the terms of the contract, FQ had no duty regarding information it knew prior to receiving Monti's device or regarding information that was in the public domain. The undisputed evidence shows that the concept of linking the force producing assembly between the guide member and the user support and the idea of lowering the pivot point where the force producing assembly mechanically linked to the guide member were both part of the public domain and known to FQ via a disclosure by Dosho Shifferaw prior to Monti's disclosure.

Second, Monti argues that because FQ has not admitted the existence of a contract, it may not assume the existence of the contract *arguendo* in order to show that even if the contract existed, the exceptions apply to the facts of this case. Monti's argument has no legal basis.

FQ is thus entitled to summary judgment on Monti's counterclaim for breach of contract.

### D. Unjust Enrichment

"It is well settled that a party may not recover in quasi-contract in the face of an express contract governing the same subject matter." *Semantic USA. Inc. v. Otis Elevator Co.*, 2006 U.S. Dist LEXIS 36717, at *33-34 (N.D. Ohio June 6, 2006) (citing *Ullmann v. May,* 147

Ohio St. 468, 72 N.E.2d 63 (Ohio 1947), *paragraph four of the syllabus*. In this case, the parties' agreement specifically addressed Monti's submission and FQ's duties with regard to the information. Accordingly, Monti cannot use a theory of unjust enrichment to recover what he cannot under breach of contract. The Court finds that summary judgment for FQ is warranted on this claim.

### III.     Conclusion

For the foregoing reasons, the Court finds that there is no genuine issue of material fact and FQ is entitled to judgment as a matter of law. Fitness Quest's motion for summary judgment is **GRANTED** and Monti's motion for partial summary judgment is **GRANTED**, in part, and **DENIED**, in part.[12] Specifically, the Court grants Monti's motion for summary judgment on FQ's claim for a declaratory judgment that no contract existed between the parties, but denies Monti's motion for summary judgment on his patent infringement claim. This case is closed.

**IT IS SO ORDERED**.

Dated: June 6, 2008

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[12] FQ's motion was for summary judgment on Monti's claims. The Court has granted FQ summary judgment on the claim for patent infringement and is unsure whether FQ still seeks a declaratory judgment of noninfringement. Because the Court has resolved Monti's claim for patent infringement without ruling on validity, the Court exercises its discretion to decline to issue a declaratory judgment regarding invalidity. *See Evans v. Franklin Cty. Court of Common Pleas*, 66 F. App'x 586, 587 (6th Cir. 2003) ("The Declaratory Judgment Act is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."). If FQ still seeks a declaratory judgment regarding noninfringement, it may submit a proposed order for the Court's consideration.