**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| FITNESS QUEST INC. | ) | Case No. 5:06-CV-02691 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| JONATHAN MONTI, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Fitness Quest Inc. ("FQ") filed the above-captioned action on November 11, 2006, seeking a declaratory judgment that it neither infringed United States Patent No. 6,932,749 ("the '749 patent"), which was issued to Defendant Jonathan Monti ("Monti") on August 23, 2005, nor violated a confidentiality agreement between the two parties. This Court held a formal hearing, commonly referred to as a *Markman* hearing, and construed a multitude of terms in a written decision on August 16, 2007. (Doc. No. 57.) *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). FQ thereafter moved for summary judgment, and that motion required this Court to engage in further claim construction. This Court granted FQ's motion for summary judgment on June 6, 2008. (Doc. No. 201.) Monti appealed to the United States Court of Appeals for the Federal Circuit, which, on May 12, 2009, issued an opinion affirming in part and vacating in part this Court's decision. (Doc. No. 205.) More specifically, the Federal Circuit vacated this Court's grant of summary judgment that FQ does not infringe claim 28 of the '749 patent. On remand, the Court is required to construe the term "body pad," along with related terms as appropriate.

A court's first task in determining whether an accused device infringes a patent is to construe the claims to ascertain their proper scope. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308 (Fed. Cir. 2003). Accordingly, the parties came before the Court on October 16, 2009, for a second *Markman* hearing on the proper construction to be accorded to claim 28 of the '749 patent. Upon consideration of the parties' briefs, argument, and the presentation of exhibits, the Court construes the disputed terms as set forth herein.

## I. Background

Relevant portions of the factual and procedural background of this case are discussed above. The interested reader is directed to the Federal Circuit's May 12, 2009 opinion for a full discussion of the background in this case. (Doc. No. 205.)

## II. Legal Standard

Claim construction is a matter of law to be decided exclusively by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Claim terms are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective date of the patent application." *Id*. at 1313. Absent an express intent to the contrary, a patentee is presumed to have intended the ordinary meaning of a claim term. *York Prods. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996).

In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and the prosecution history (if in evidence). *Phillips*, 415 F.3d at 1313. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582. "The appropriate starting point [. . .] is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

The claims also "must be read in view of the specification, of which they are a part." *Phillips*, 445 F.3d at 1315. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. By expressly defining terms in the specification, an inventor may "choose [. . .] to be his or her own lexicographer," thereby limiting the meaning of the disputed term to the definition provided in the specification. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). Although claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187. However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistent with that limitation. *Id.*

Courts also may consider the patent's prosecution history, if in evidence. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation

that was disclaimed during prosecution. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). The prosecution history "constitutes a public record of the patentee's representations concerning the scope of and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (quoting *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)). The prosecution history may reveal "whether the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms." *Id.* (quoting *Nystrom v. TREX Co.*, 374 F.3d 1105, 1113 (Fed. Cir. 2004)). "Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language." *Id.* (citations omitted). Any such disclaimer must be clear and unambiguous. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-25 (Fed. Cir. 2003). Courts must remain mindful, however, that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317 (citations omitted).

In most circumstances, analysis of the intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Extrinsic evidence may be considered, as it "'can shed light on the relevant art,' but is less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)). Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination

4

of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, the court may appropriately consult "trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

In construing claims, the Court determines whether or not a term requires construction. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The Court is not required to accept a construction of a term, even if the parties have stipulated to it, but instead may arrive at its own construction of claim terms, which may differ from the constructions proposed by the parties. *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005).

## III. Construction of Disputed Terms and Phrases

Claim 28 of the '749 patent reads, in its entirety, as follows:

28.  A multipurpose exercise apparatus adapted for providing an individual with support as a user moves between an upper first position and a lower second position during performance of an exercise, comprising:

an elongated user support having a first end and a second end, the user support including a horizontally oriented body pad with a first end and a second end and an auxiliary body support adjustably coupled to the user support and extending from the second end of the user support adjacent the second end of the body pad, the auxiliary body support including a pivotally mounted pad assembly adapted for engaging different body parts in various orientations, the body pad having a longitudinal axis and a lateral

5

extent extending perpendicular to the longitudinal axis and between a first side of the body pad and a second side of the body pad;

a guide member pivotally secured to the user support for movement relative thereto between the first position and the second position wherein the first position is oriented above the second position and the guide member pivots about a substantially horizontal axis, the guide member including a transversely oriented support extending across the user support such that a user may rest a body member thereupon while performing the exercise, the transversely oriented support extending substantially across the entire lateral extent of the user support; and

a force producing assembly mechanically linked between the user support and the guide member, the force producing assembly selectively applying a force biasing the guide member toward the first position such that as a user is supported against the effect of gravity as the user moves between the first position and the second position.

('749 patent.) Both parties agree, as indeed they must in light of the Federal Circuit opinion, that several claim terms and phrases require construction by the Court.

### A.  "Body Pad"

"The appropriate starting point [. . .] is always with the language of the asserted claim itself." *Comark Communications,* 156 F.3d  at 1186. "When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Multiform Desiccants, Inc. v. Medzam Ltd*., 133 F.3d 1473, 1478 (Fed. Cir. 1998).

Claim 28 of the '749 patent describes the body pad as having "a longitudinal axis" and "a lateral extent extending perpendicular to the longitudinal axis." Claim 28 also teaches that the lateral extent runs between "a first side" and "a second side" of the body pad. Claim 28 further teaches that the body pad has "a first end and a second end." As the Federal Circuit noted in its opinion, "claim language involving 'sides' and 'ends' has been used as a somewhat obtuse

6

way to describe a rectangular structure in a patent." (Doc. No. 205 at p. 9 n.4.) While the '749 patent does not explicitly state that the longitudinal axis runs between the first end and the second end, it is plainly obvious that it must do so, as it must be perpendicular to the lateral extent which runs between the two sides. With these six reference points established, Monti argues that the '749 patent claim language explicitly orients the body pad within the exercise machine, obviating any need to resort to dictionary definitions or other extrinsic evidence. The Court agrees.

Claim 28 instructs that the second end of the body pad is "adjacent" the second of the user support, and that the auxiliary body support is "adjustably coupled to the user support." By identifying which of the four edges of the body pad is "the second end," this statement alone allows the location of the first end of the body pad to be determined. However, an independent confirmation of the first end's location and definition is found in claim 15 of the '749 patent, which states "the guide member pivots about a substantially horizontal axis which is substantially adjacent to the first end of the body pad."[1]

FQ argues that any inclusion of the terms "first end," "second end," "a longitudinal axis," and "a lateral extent" would be superfluous because "these limitations are already present in, and define the scope of, claim 28." (Doc. No. 216, p. 8.) In support, FQ cites *Merck & Co., Inc., v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), where FQ claims the Federal Circuit revised "a lower court's construction to remove a term expressly present elsewhere in the same claim, so that the express term 'is no longer excess verbiage, but is instead

---

[1] Though claim 15 is no longer at issue for infringement, "[o]ther claims of a patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-1315 (Fed. Cir. 2005). "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)).

necessary.'" (Doc. No. 216, p. 4 (citing *Merck & Co.*, 395 F.3d at 1372).) In *Merck & Co.*, the district court construed the term "about 35 [or 70] mg to mean the amount of the derivative compound that gives exactly 35 [or 70] mg of the active compound." *Merck & Co.*, 395 F.3d at 1369. In the patent specification at issue, the term "about" and the term "on an alendronic acid basis" were used to describe a dosage strength. *Id.* at 1372. The district court's construction of the term "about" rendered the term "on an alendronic acid basis" unnecessary, whereas the Federal Circuit's decision to construe "'about' to mean its accepted and ordinary meaning of 'approximately,'" made the phrase "on an alendronic acid basis" necessary, and not "excess verbiage." *Id.*

The '749 patent does not present the situation present in *Merck & Co.* At the outset, *Merck & Co.* does not stand for the proposition for which FQ states. Moreover, Monti is not suggesting that this Court define "body pad" in a manner which renders the other words superfluous. Indeed, reading claim 28 of the '749 patent closely, the words "a longitudinal axis" and "a lateral extent" appear in an explicit description of the body pad, giving added definitional fidelity to the term. Using these descriptive terms to construe the term "body pad" is not prohibited by *Merck & Co.*, but is rather perfectly appropriate. Claim 1 of U.S. Patent 5,703,327, cited by the Federal Circuit in its opinion in this case, consists of "[. . .] a first substantially rectangular end panel *having* first and second end edges and first and second side edges [. . .]" (Doc. No. 206, p. 9 n.4 (emphasis added).) To say the rectangular panel in the '327 patent could not be construed using the words "end" or "side" simply because those words also appear in the claim itself is nonsensical.

FQ and Monti vehemently disagree as to the construction of the term "body pad" with respect to the body pad's function. FQ insists the proper construction is that the body pad

8

"is a cushion that engages different body parts," while Monti is equally insistent that the proper construction should define body pad as the "[. . .] part of the exercise apparatus on which the lower body of the user is supported during an exercise [. . .]"

The essence of Monti's argument is twofold: (1) the body pad is described in Claim 15 as the part of the machine upon which the lower body of the user [is] supported, and (2) that FQ tacitly concedes that the body pad, as displayed in figures 7, 8, and 10, engages the front, back, and back of the user's lower body, respectively, during an exercise. FQ acknowledges that Claim 15 does indeed contain the lower body limitation, but argues that importing this limitation into Claim 28 would violate the rules of claim construction.[2] In support of its proposed construction, FQ argues that the specification shows that the body engages different body parts, focusing especially on figure 8, which, according to FQ demonstrates "it is apparent that a user performing a push up as depicted in Figure 9 would contact the body pad with her knees and things." (Doc. No. 209 at p. 10.) Furthermore, FQ insists that the intrinsic evidence, specifically figures 1, 2, and 7-10, makes clear that the body pad is cushioned.

As Monti persuasively argues, Claim 28 does not simply require a "pad," but rather requires a "body pad." However, it does not necessarily follow that the proper meaning to be accorded to this term involves the "lower body." First, the patented machine has a separate, independent component which is explicitly designated the "lower body support." ('749 patent,

---

[2] At the hearing, Monti spoke extensively on claim differentiation and suggested to the Court that because the term "body pad" can bear only one interpretation, the doctrine of claim differentiation, which is a guide and not a rigid rule, did not apply to this case. FQ expressly and immediately disclaimed making a claim differentiation argument. The doctrine of claim differentiation precludes the reading of limitations found in narrower, dependent claims into broader, independent claims. *See, e.g., Xerox Corp. v. 3M Corp.*, 267 F. 3d 1361, 1366 (Fed. Cir. 2001). The Federal Circuit has acknowledged, however, that the claim differentiation doctrine applies only in circumstances where a limitation of a dependent claim is the only or primary meaningful difference between it and the independent claim. *See Ecolab, Inc. v. Paraclipse, Inc*., 285 F.3d 1362, 1375 (Fed. Cir. 2002). Claims 15 and 28 are each independent claims; neither is dependent on the other. Therefore, the claim differentiation doctrine is inapplicable here.

Col. 8, lines 33-34.) Further, as FQ notes, nothing in Claim 28 suggests that a "body pad" is inherently limited to supporting a user's lower body. Moreover, the descriptive language in Claim 15 that describes the body pad as supporting the user's lower body is not truly a limitation, but a description of the function of the body pad while used in a specific manner, a back extension exercise.

FQ's proposed construction, however, is also problematic. Just as FQ notes that nothing in Claim 28 requires limiting the term body pad to supporting a user's lower body, nor does anything in Claim 28 require that the body pad be cushioned. At the hearing, FQ argued, in defense of the position that the body pad must be cushioned, that "nobody is going to want to sit on a steel [surface] and do a sit up [or] sit on a piece of wood and do a sit up like that. It would be painful to do that." Even if figures 1, 2, and 7-10 show the body pad to be "cushioned," a proposition this Court finds far from certain, FQ's proposed construction reads into the patent a limitation from the preferred embodiment, which is clearly improper. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341 (Fed. Cir. 2009) ("The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.")

FQ supports its contention that the term "body pad" be construed as "engages different body parts" due to the description of the auxiliary body support as found in Claim 28. The auxiliary body support is expressly defined as including "a pivotally mounted pad assembly adapted for engaging body parts in various orientations [. . .]" The Court agrees with Monti's contention that this argument is a *non-sequitur*. Claim 28 gives an express definition to the complete term "auxiliary body support," not to the term "body."

10

In light of the Court's decision to decline to adopt the construction of either party, the Court must still accord the proper construction to the term "body pad." While, as explained above, it is not proper to import the limitation "lower body of the user" into the construction, it is clear that the body pad's function is to provide support to the user. Indeed, Claim 28 teaches us that the body pad is included in the "user support." Further, figures 7, 8, and 10 clearly depict the body pad as supporting the user's body in one fashion or another. Figure 9, which depicts the machine being used for a push up exercise, does not depict the user's body being supported by the body pad. FQ, however, argues that it is apparent that the user performing a push up as depicted would contact the body pad during the exercise. This is disputed by Monti. The Court, however, finds it difficult to believe the user could place herself in the position depicted in figure 9 without first using the body pad to support her body.

Therefore, the Court construes the term "body pad" to mean "the substantially rectangular part of the exercise apparatus on which the body of the user is generally supported during an exercise. The body pad is bounded by a first end adjacent to the horizontal axis of the guide member and a second end adjacent the auxiliary body support, with a longitudinal axis running between the two ends and a lateral extent extending perpendicular to the longitudinal axis and between a first side and second side of the body pad."

**B.  "First End"**

FQ and Monti agree that the "first end" and the "second end" are opposite each other and define the boundaries of the body pad. Their agreement ends, however, as to the precise definition of the term "first end." As incorporated into the definition of "body pad" as discussed above, the Court holds that the term "first end" shall be construed to mean "the boundary of the body pad adjacent to the horizontal axis of the guide member."

11

FQ argues that, because the construction accorded above is derived from language present in Claim 15, and not Claim 28, it is improper. However, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. Moreover, as discussed above, Claim 28 is not a dependent claim of Claim 15, nor vice versa. Therefore, the Court need not give rise to the presumption that a limitation present in a dependent claim is not present in the independent claim. *Id.* FQ further argues that the term "first end" must include an "actual boundary," which it implies must include a physical demarcation. The Court agrees that the term "first end" must include an actual boundary, meaning a defined end, but disagrees that an actual boundary necessary implies a physical demarcation or discontinuity in material. The Federal Circuit implied as much in its opinion, when it proposed three different possible points as the possible "fourth boundary" (first end) of the body pad, the seat pivot bolt, the chairback pivot bolt, or the intersection of the seat and the chairback.[3] (Doc. No. 205 at p. 14.) Monti also makes an apt analogy to a baseball bat, which has a handle and a barrel, each with a definite boundary, but from the same contiguous material with no physical separation. To be certain, the "first end" of the body pad is indeed a defined boundary, but to limit that boundary to a point of physical separation would be to impermissibly read into Claim 28 an absent limitation.

### C.  "Horizontally Oriented"

Claim 28 requires the body pad to be "horizontally oriented." FQ proposes that this term be construed as requiring the body pad to be "set in a horizontal direction." At the hearing, it became apparent that FQ uses the word "set" to mean fixed or immovable. Monti

---

[3] This reference is, of course, to the alleged infringing device and not Monti's invention. The underlying reasoning, however, supports the conclusion that the end of the body pad need not include a physical demarcation or separation.

urges that the proper construction is "the body pad is sufficiently horizontal to support a user's lower body during the exercise."

Turning first to FQ's proposal, there is nothing in Claim 28, or elsewhere in the '749 patent that suggests the body pad must be set, fixed, or immovable during the use of the patented machine. To be certain, the preferred embodiments as depicted in figures 7-10 appear to show the body pad as being fixed, but as has been recited at length, importing limitations from the preferred embodiments is improper. Therefore, the Court rejects the suggestion that horizontally oriented means set, fixed, or immovable.

As to the other portion of FQ's proposed construction, "in a horizontal direction," the Court finds it significant that the modifier used in the claim is "horizontally oriented" and not merely "horizontal." This implies that "horizontally oriented" must mean something different than "horizontal," a point which FQ acknowledged at the hearing: "It doesn't have to be perfectly horizontal, okay, we're not saying that [. . .] We accept that, but it can't be vertical." (Doc. No. 222 at p.52, lines 3-6.) *See Phillips,* 415 F.3d at 1314. This is consistent with the preferred embodiment as displayed in Figure 7, which clearly shows the body pad to be non-horizontal. While Figure 7 is the preferred embodiment for Claim 15, and not Claim 28, this Court notes the term "horizontally oriented" is used in exactly the same manner in that claim as in Claim 28, i.e., directly modifying and immediately preceding the term "body pad." Under *Phillips,* as discussed earlier, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. And Federal Circuit "case law generally counsels against interpreting a claim term in a way that excludes the preferred embodiment from the scope of the invention." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed.

13

Cir. 2008). The patent itself further teaches that the body pad is "also comprised of an angular adjustment member." ('749 patent, Col. 8, lines 23-24.) Therefore, to construe "horizontally oriented" to mean "horizontal" would be improper.

On the other hand, Monti's proposed construction construes the term horizontally oriented in a manner which includes each of the preferred embodiments within the scope of the invention. Furthermore, Monti's construction is consistent with the purpose of the body pad, generally supporting the user's body during exercise, and implicitly recognizes that a certain point, or angle, the body pad will no longer be "sufficiently horizontal" to perform that function. Therefore, the Court construes the term "horizontally oriented" to mean "the body pad is sufficiently horizontal to support a user's body during the exercise."

### D. "Lateral Extent"

A patentee may act as his own lexicographer by specifically defining terms of a claim contrary to their ordinary meaning. *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1376 (Fed. Cir. 2006) (quoting *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004)). "Interpretation of descriptive statements in a patent's written description is a difficult task, as an inherent tension exists as to whether a statement is a clear lexicographic definition or a description of a preferred embodiment." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003). In such situations, the court aims "to interpret claims 'in view of the specification' without unnecessarily importing limitations from the specification into the claims." *Id.* (citing *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204-05 (Fed. Cir. 2002)). "When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364,

14

1370-71 (Fed. Cir. 2005) (citing *Bell Atl. Network Servs. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)).

FQ argues that the proper construction of the term "lateral extent" is "width along the lateral direction of the body pad." Monti counters by arguing that "lateral extent" means "dimension of the body pad extending perpendicular to the longitudinal axis and between the first side and the second side of the body pad." The '749 patent explicitly defines the lateral extent as "extending perpendicular to the longitudinal axis and between the first side and the second side of the body pad." ('749 patent, Col. 15, lines 28-30.) The term is clearly defined by the words of the patent. Therefore, the Court substantially adopts Monti's construction of the term lateral extent and construes that term to mean the "dimension of the body pad extending perpendicular to the longitudinal axis and between the first side and the second side of the body pad."

### E.  "Longitudinal Axis"

The term "longitudinal axis" is not as clearly defined as "lateral extent" by the words of the '749 patent. FQ argues that, due to the dictionary definition of the term "longitudinal," this term must be construed to mean "an axis along the longest direction of the body." The Court disagrees, and instead holds that the term "longitudinal axis" can be construed solely according to intrinsic evidence, namely the words of the patent itself, thereby obviating the need to resort to extrinsic evidence such as a dictionary definition.

The '749 patent explicitly defines the term lateral extent, as discussed above, as extending between the first and second sides of the body pad. And the '749 patent also explicitly states that the lateral extent and the longitudinal axis are perpendicular to each other. Moreover, the body pad is bounded, by the terms of the patent, by sides and ends. If the lateral extent

15

extends between the two sides and is perpendicular to the longitudinal axis, then it necessarily follows that the longitudinal axis must run between the first and second end. Therefore, the Court construes the term "longitudinal axis" to mean "an axis of the body pad extending between the first end and the second end."

### F.  "Transversely Oriented Support" and "Extending Across"

Claim 28 teaches that the guide member includes "a transversely oriented support extending across the user support such that a user may rest a body member thereupon while performing the exercise, the transversely oriented support extending substantially across the entire lateral extent of the user support." FQ argues that the term "transversely oriented support" should be construed to mean "a support separate from and transverse to the body pad." Monti offers "the transversely oriented support is the part of the guide member on which the user may rest a body member (e.g. a torso) while performing an exercise. The transversely oriented support extends substantially across the entire lateral extent of the user support." Monti also offers a separate definition for "extending across," which he interprets to mean "the transversely oriented support is elevated above the user support, and not necessarily vertically above the body pad and the user support."

FQ's proposed construction again improperly imports a limitation that cannot be found in the language of the patent. There is simply no requirement that the transversely oriented support be physically "separate" from the body pad. While the body pad and the transversely oriented support are different components of the exercise machine, it does not necessarily follow that there must be a physical separation, or gap, between the two.

Claim 28 also requires the transversely oriented support to "extend[] substantially across the entire lateral extent of the user support." This inelegant phrase presents an appropriate

16

time to apply the teachings of *Merck & Co., supra.* The Court must construe the phrase in a manner which gives meaning to each word, and not in a way that renders any word "excess verbiage." The troublesome word here is "substantially." It is paradoxical for something to extend across an *entire* distance, but at the same time only extend *substantially* across that same distance. In this case, however, an alternate construction is possible. Rather than reading the term substantially to modify the word across, the Court shall give meaning to the word by reading the phrase as "extending substantially." In this sense, that term can be construed to require the substantial extension of the transversely oriented support across the entire lateral extent of the user support, with substantial extension interpreted as a requirement that the transversely oriented support be across the entire lateral extent of the user support for a substantial portion of the exercise. This construction also gives credence to *Helmsderfer's, supra,* teachings, because this construction includes each of the preferred embodiments within the invention.

Thus, while Monti is correct that the transversely oriented support need not necessarily be above the body pad, which is included in the user support, the express words of Claim 28 require the transversely oriented support to extend across the entire lateral extent of the user support, and such extension to be substantial, meaning during a significant portion of the exercise.

Therefore, the term "transversely oriented support" is properly construed to mean "the part of the guide member on which the user may rest a body member while performing an exercise." The Court declines to construe the term "extending across," but instead construes the phrase "extending substantially across the entire lateral extent of the user support" to mean "over and above the entire lateral extent of the user support for a significant portion of the exercise." There is no requirement that the transversely oriented support ever be over, above, or over and

17

above the body pad.

### G.  "Selectively Applying a Force"

In this Court's August 16, 2007, *Markman* hearing, this Court construed the term "selectively applying a force" to mean "the force producing assembly applying an appropriate force to bias the guide member as needed during the exercise." (Doc. No. 57 at p. 14-15.) While neither party challenged this construction on appeal (Doc. No. 205 at p. 15 n.7), both parties now contend that the Court's prior construction needs clarification with respect to the phrase "appropriate force [. . .] as needed during the exercise." (Doc. No. 209 at p. 27; Doc No. 211 at p. 20.) The parties disagree as to what that clarification should be.

At the outset, this Court recognized in its first *Markman* order that there are two notions of selection/selectivity in the patent. Relevant here, in Claim 28, the patent language references the exercise machine acting selectively. Specifically, that Claim teaches the force producing assembly is mechanically linked to the user support and the guide member and that the force producing assembly is selectively applying a force biasing the guide member. Contrast dependent Claim 29, which provides for a user input, namely the adjustment of the force producing assembly by the user to vary the force transmitted to the guide member. The doctrine of claim differentiation, discussed *supra*, is appropriate here. The only meaningful difference between Claim 28 and dependent Claim 29 is the provision for the user's ability to adjust the force producing assembly to vary the force transmitted to the guide member. The doctrine of claim differentiation prohibits this Court from reading the user-variable force adjustment limitation from dependent Claim 29 into the broader, independent Claim 28. *See Xerox Corp.* 267 F.3d at 1366.

The Federal Circuit, in its opinion, also recognized this distinction when

18

discussing an example cited by Monti in earlier briefing. "Monti's example of the 120-pound woman and the 250-pound man appears to have been an attempt to explain the difference between a machine 'selectively applying' an amount of force as recited in independent claim 15 from a user 'selectively adjusting' the amount of force in dependent claim 16." (Doc. No. 205 at p. 18.) The same reasoning is equally applicable to Claims 28 and 29. For these reasons, the Court reaffirms its conclusion from the first *Markman* hearing that nowhere in the term or language surrounding it is the notion of user selection reflected. Instead, the language reflects the action of the device, not the choice of the person using the device.

FQ's proposed clarification requests this Court to add the words "by the user" to the "appropriate force [. . .] as needed" construction. "The context in which a term is used in the asserted claim can be highly instructive." *Phillips,* 415 F.3d at 1314. Here, as Monti persuasively argues, there are two notions of selection/selectivity that are present in the '749 patent. Claim 29 provides for the adjustment of force by the user, presumably based on the user's individual needs or training desires. Claim 28, on the other hand, speaks to the selection of force by the force producing assembly, part of the machine. Further instructive is the patent specification, which discloses the use of a gas spring as the force producing member.[4] ('749 patent, Col. 8 at lines 42-45.) As FQ concedes, the principles of operation of a gas spring are well-known to a person of ordinary skill in the art, "such a spring generates a predetermined force that varies (increases and decreases) with the level of compression of the cylinder." (Doc. 216 at 23.) A further consideration regarding FQ's proposed construction is the fact that the force producing member, disclosed as a gas spring in the specification, would not appear to be able to affirmatively select

---

[4] "The purposes of the specification are to teach and enable those of skill in the art to make and use the invention." *Phillips,* 415 F.3d at 1323.

19

an appropriate force on an individual user basis. Indeed, Claim 29 appears to recognize this limitation and provides for a user adjustment method of selecting force on an individual basis.

Monti's proposed clarification reads as follows:

> Appropriate [. . .] as needed during the exercise means progressively increasing upward supportive force on a body member (e.g., the torso) of the user as the user moves through the exercise and more of the weight of that body member is supported by the transversely oriented support of guide member, and a progressively decreasing upward supportive force on the same body member as the user returns to the initial position in biasing the guide member as needed during the exercise. This involves a progressive angular displacement of the transversely oriented support of the guide member as the user moves through the exercise.

(Doc. No. 211 at p. 19.) While Monti's construction is somewhat verbose, the Court believes it is appropriate. First, it accurately reflects the nature of the force producing assembly as disclosed in the patent specification, e.g., a gas spring. Second, it reflects the fact that the force producing assembly, or machine, is applying the appropriate amount of force for the user in response to the changing angular displacement of the guide member. The Court disagrees with FQ's contention that "a one-size-fits-all progressive increase and decrease in force according to angular displacement does not incorporate the normative requirement of an 'appropriate [. . .] as needed' force." (Doc. No. 216 at p. 24.) Rather, the force producing assembly applies the appropriate force necessary to bias the guide member at a given angular displacement during the exercise.

## IV. Conclusion

The terms to which construction and or clarification has been requested are to be construed as reflected in this Memorandum Opinion and Order.

## V. Subsequent Proceedings

Now that the Court has construed the disputed terms, counsel shall confer and, by July 7, 2011, submit in writing their joint proposal as to further case management deadlines. Counsel shall also indicate whether there is any interest in pursuing Alternative Dispute Resolution and, if so, (1) how they would propose fitting that into the schedule, and (2) what method of ADR they would prefer to use.[5]

**IT IS SO ORDERED**.

Dated: June 20, 2011

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[5] There are several ADR methods available, including use of the Court's ADR panel, use of the services of the assigned magistrate judge, use of another district court judge, and private ADR.

21